AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▾

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Apple iPhone with IMEI 357130736160478 and black
BLU cell phone with unknown IMEI currently in the
possession of the NMRCFL in the District of New Mexico.

)
)
)
)
)
)

Case No.  MR 24-1291

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119(3); 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j); 18 U.S.C. § 1201(a)(1); 18 U.S.C. §§ 922(g)(1), (g)(2), | Carjacking Resulting in Death; Causing Death by Discharge of a Fiream During and in Relation to a Crime of Violence; Kidnapping Resulting in Death; Felon in Possession of a Firearm; Possession of a Stolen Firearm; Interstate Transportation of a Stolen Motor Vehicle; Interstate Flight to Avoid Prosecution |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Connelly, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
electronically signed and telephonically sworn *(specify reliable electronic means)*.

Date:  July 10, 2024

City and state:  Albuquerque, New Mexico

_____
*Judge's signature*

Hon. Karen B. Molzen, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE SILVER APPLE IPHONE WITH IMEI 357130736160478 AND THE BLACK "BLU" CELL PHONE WITH UNKNOWN IMEI CURRENTLY IN THE POSSESSION OF THE NEW MEXICO REGIONAL COMPUTER FORENSIC LABORATORY IN THE DISTRICT OF NEW MEXICO. | Case. No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Michael F. Connelly, United States Department of Justice, Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search of the silver Apple iPhone with IMEI 357130736160478 and the black "BLU" brand cell phone with unknown IMEI (the SUBJECT DEVICES), both currently in the possession of the New Mexico Regional Computer Forensics Laboratory (NMRCFL) in the District of New Mexico, further described in Attachment A for the things described in Attachment B.

2.      I am a Special Agent of the FBI and have been so employed since July 1999. I am currently assigned to the FBI Columbia, South Carolina, Field Office, Myrtle Beach Resident Agency. My principal duties include the investigation of, among other matters, violent crimes, drug trafficking, public corruption, felony gun use and possession, kidnapping, and threats of violence in violation of the laws of the United States. As such, I am an "investigative or law

enforcement officer" of the United States within the meaning of section 2510 (7) of Title 18 United States Code, and section 878 of Title 21 United States Code, and am empowered by law to conduct investigations and to make arrest and searches for offenses enumerated in Section 2516 of Title 18, and Title 21 of the United States Code. I am a federal law enforcement officer under applicable provisions of the United States Code and Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation, presentation, and execution of search warrants.

3.      I base this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers, a review GPS and other electronic data to include video surveillance, cellular phone location data, interviews of witnesses, my training and experience, and my personal review of records, documents, and items lawfully obtained from third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, I have set forth sufficient information to establish probable cause for the issuance of the requested search warrant to search SUBJECT DEVICES for items listed in Attachment B. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2119(3) (Carjacking Resulting in Death); 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j) (Causing Death by Discharge of a Firearm During and in Relation to a Crime of Violence); 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in

Death); 18 U.S.C. §§ 922(g)(1), (g)(2), and 924 (Prohibited Person in Possession of a Firearm);

18 U.S.C. § 922(j) (Possession of a Stolen Firearm); 18 U.S.C. § 2312 (Interstate Transportation

of a Stolen Motor Vehicle); and 18 U.S.C. § 1073 (interstate flight to avoid prosecution) were

committed by JAREMY ALEXANDER SMITH, and that evidence of these violations may be

found within the SUBJECT DEVICES.

**PROBABLE CAUSE**

***The Kidnapping and Murder of Jane Doe 1 in South Carolina on March 13, 2024***

5.      On March 15, 2024, the body of Jane Doe 1 was found in a wooded area behind an

abandoned residence near 823 Jones Drive in Nichols, South Carolina.  She was face-down with

her face partially covered in plastic wrap and two bandanas. Her sweatshirt was pulled up over her

head and there appeared to be a bullet entrance hole in the hood of her sweatshirt. A plastic zip tie

was found near her arm and marks were observed on her wrist indicating that the tie had possibly

been used to secure her wrist. She had a single bullet wound to the back of her head. The quantity

of pooled blood on the ground under her head at the body recovery site and her bloody face

indicates she was shot at that location. The materials wrapped around her head and the zip tie

located near her body indicate Jane Doe 1 was abducted, transported to that location while still

alive, and then murdered on scene.

6.      According to Jane Doe 1's roommate, Jaremy Alexander SMITH (hereinafter

"SMITH") resided at a house located behind Jane Doe 1's residence.  SMITH spent the night prior

to her abduction inside Jane Doe 1's house with the roommate, with whom he was involved.

SMITH left Jane Doe 1's residence at approximately 6:30am on March 13, 2024, with Jane Doe

1's roommate. After the disappearance of Jane Doe 1, Jane Doe 1's roommate discovered that she

was missing a Taurus 9mm pistol, believed to be the same pistol that was recovered from the scene

where SMITH was arrested on March 17, 2024, in New Mexico.  (see ¶ 33 , infra).

7.      Jane Doe 1 owned a white BMW with South Carolina plate EA1523 and Vehicle Identification Number (VIN) WBADX7C5XBE261443.  Law enforcement has established that the vehicle was equipped with onboard GPS capabilities, thereby enabling law enforcement to track the vehicle's location as described further herein.

8.      Based on SUBJECT DEVICES location data, between 6:00am and 10:00am on March 13, 2024, the SUBJECT DEVICES, Jane Doe 1's phone, and the BMW were all located near Jane Doe 1's residence. Jane Doe 1 was last known to be alive at her residence at approximately 10:00am based on a confirmed phone call with an associate. The latitude/longitude provided by the BMW's GPS indicates it departed the vicinity of Jane Doe 1's residence at approximately 11:57am and stopped near 823 Jones Drive at 1:54pm, which is the area where Jane Doe 1's body was subsequently located.  Location data for SUBJECT DEVICES indicate they remained at or near Jane Doe 1 and/or SMITH's residence during the approximate two-hour period where it appears Jane Doe 1 was kidnapped, killed, and her body disposed. Per the GPS on the BMW, at approximately 2:19pm – that is, 22 minutes after departing the area where Jane Doe 1's body was later found – the BMW stopped near 805 N. Smith Street, Mullins, SC. A resident in the area was outside at that time and observed a white BMW park near a dead end on his street. He observed a black male exit the vehicle, walk towards Breakers Gas Station, and return to the BMW with a drink. A review of video from Breakers Gas Station showed an individual, consistent in appearance to SMITH, enter the store and purchased a drink. I believe these facts indicate that SMITH used the BMW to travel to the location where Jane Doe 1's body was left. Therefore, I believe he carjacked the BMW from Jane Doe 1 between 10:00am and 2:00pm on March 13, 2024, and used it in furtherance of the abduction, murder, and disposal of Jane Doe 1's body.

9.     Additional facts establishing probable cause that the SUBJECT DEVICES contain evidence regarding the abduction and murder of Jane Doe 1 relates to the location where Jane Doe 1's phone was discarded along a road in Marion, South Carolina. The FBI was provided the exact location where Jane Doe's phone was subsequently tracked and recovered by law enforcement. Phone analysis of Jane Doe 1's phone indicated it was moved from her residence at approximately 4:00pm on March 13, 2024, to the location where it was subsequently found. Location data from both SUBJECT DEVICES is not inconsistent with them being in the same area between 5:00pm and 5:24pm on March 13, 2024, where Jane Doe 1's phone was found. Therefore, there is probable cause to believe SUBJECT DEVICES could contain evidence connecting SMITH to the disposal of Jane Doe 1's phones.

10.    Additional evidence of weapons-related criminal activity obtained by investigators in South Carolina indicate that SMITH used Jane Doe 1's stolen BMW and the SUBJECT DEVICES around the time of an armed robbery on March 14, 2024, as he departed South Carolina for New Mexico. Specifically, phone data placed the SUBJECT DEVICES and the stolen BMW near a specific residence in Effingham, South Carolina at 1:00am on March 14, 2024.   A subsequent interview of the occupant of that residence, Jane Doe 2, revealed that after a sexual interaction with SMITH in a vehicle outside the residence, SMITH pointed a black pistol at her head and demanded money. Jane Doe 2 surrendered the money and her purse to SMITH.

11.    Jane Doe 2 advised that SMITH was accompanied by another individual, who the FBI later established was J.J., an associate of SMITH.  According to Jane Doe 2, J.J. searched the back of her car. Jane Doe 2 further advised that SMITH left a box of pistol ammunition on the floor of her car, which she surrendered to law enforcement.

12.    FBI agents interviewed J.J., who was present during the armed robbery described

above. He stated that SMITH robbed Jane Doe 2 at gunpoint, but J.J. did not provide information that he searched the back of Jane Doe 2's car. J.J. was indicted in U.S. District of South Carolina for possession of weapons based on his participation in the theft of six guns from Jane Doe 1's house on March 13, 2024, which occurred approximately three hours prior to the armed robbery of Jane Doe 2.

13.     Location data from SUBJECT DEVICES is not inconsistent with both phones being present near Jane Doe 2's residence in Effingham, SC at the time of the armed robbery and therefore there is probable cause to believe the SUBJECT DEVICES could contain further evidence placing SMITH at the scene of the crime and coordinating the armed robbery of Jane Doe 2.

14.     Based upon review of GPS data from the BMW, video recovered from locations in South Carolina after 10:00am on March 13, 2024, and interviews conducted by law enforcement, I believe SMITH kidnapped Jane Doe 1 from her residence after 10:00am on March 13, 2024, carjacked her BMW, transported her to the vicinity of 823 Jones Drive, and murdered her at approximately 1:55pm. Consistent with this belief, SMITH has been charged in South Carolina state court with the murder and kidnapping of Jane Doe 1.

15.     Although the SUBJECT DEVICES do not appear to register location data of travel to the location where Jane Doe 1's body was found, phone data does indicate that the SUBJECT DEVICES were used prior to and after Jane Doe 1's abduction and murder, during the period of time when Jane Doe 1's phone was discarded, and when SMITH committed the alleged armed robbery in Effingham, South Carolina. Therefore, I believe there is probable cause to believe SUBJECT DEVICES contain evidence that pertain to the crimes listed in this affidavit which occurred in both South Carolina and New Mexico.

16.    GPS data from the white BMW establishes that the vehicle was driven across the United States beginning on March 13, 2015, with the last datapoint being on the morning of March 15, 2024, at the approximate location of mile-marker 318 in Quay County, New Mexico.

### The March 15, 2024, Carjacking and Murder of NMSP Officer John Doe

17.    Information regarding the events of March 15, 2024, in New Mexico were provided to your affiant by FBI Albuquerque. On March 15, 2024, at approximately 4:47am, New Mexico State Police (NMSP) Officer John Doe[1] was dispatched to the area of mile marker 318 on Interstate 40 (I-40), an area within Quay County in the District of New Mexico, to assist a disabled motorist. NMSP dispatch had received at least one call for service regarding an African American male trying to flag down passing motorists. Officer Doe arrived at the scene at approximately 5:04am.

18.    According to in-car dashcam footage (which contained video but no audio) and footage from a body worn camera attached to Officer Doe (which contained both video and audio), when Officer Doe arrived on scene, an African American male, later identified as SMITH, who was wearing a tan-in-color hoodie-style jacket with a different colored hood, exited the driver's area of a white BMW with South Carolina license plate EA1523 and Vehicle Identification Number WBADX7C5XBE261443, i.e., Jane Doe 1's vehicle. At that point, the white BMW was parked on the right shoulder of the interstate. SMITH exited the driver's seat of the vehicle and walked calmly to the passenger window of Officer Doe's patrol vehicle. When he arrived, SMITH explained to Officer Doe that he had a flat tire and needed assistance. Law enforcement later established that the vehicle in fact had a flat tire. SMITH and Officer Doe spoke briefly about the flat tire, and Officer Doe did not exit the patrol vehicle during this sequence of events.

---

[1] The officer's full identity is known to law enforcement but anonymized here to protect his identity pursuant to 18 U.S.C. § 3771(a)(8).

Approximately 20 seconds into the conversation, Officer Doe offered to give SMITH a ride to a nearby town because no repair shop was open. Officer Doe then asked SMITH to walk to the front of the patrol vehicle.

19.     Immediately afterward, a flash and loud noise consistent with gunfire was observed on the recordings. Officer Doe appeared to have been shot; he did not respond and slumped to the right.

20.     The dashcam video then depicts SMITH walking from the passenger side of the car, around the front of the vehicle, to the driver's side window.  When he arrived, SMITH paused briefly to allow a tractor trailer to pass, and, immediately after it did, the sound of two more gunshots is heard on the recording.  SMITH then entered the driver's seat of Officer Doe's patrol unit and drove away westbound on Interstate 40 with Officer Doe still inside the vehicle.

21.     After initially arriving on scene, Officer Doe failed to respond to dispatch. It is common practice for officers to advise dispatch when they are on scene, and during the time officers are on scene dispatch will call them to ensure their safety.

### *Law Enforcement Response to the Scene of the Carjacking and Murder in New Mexico*

22.     A duress signal, which was connected to Officer Doe's in-car radio or his portable radio, was activated at approximately 5:09am; that is, about five minutes after Officer Doe arrived on scene.  In response, backup units were dispatched to the location where officers found an unoccupied white BMW vehicle with a flat tire at mile marker 318 on I-40.

23.     In the meantime, dashcam footage from Officer Doe's vehicle show the vehicle being driven eastbound on I-40, eventually getting off on the frontage road (SMITH drove for 4 minutes and 24 seconds on I-40 before exiting onto the frontage road).  After exiting, SMITH drove for less than one minute on the frontage road before stopping, removing Officer Doe from

the vehicle, and driving off.

24.     Approximately one hour later, law enforcement found Officer Doe at this location, which was near mile marker 311 off to the side of the off ramp leading to the frontage road on the north side of I-40. Officer Doe was found with multiple gunshot wounds to the head and neck. Responding officers observed that Officer Doe was still alive at this time; he was breathing and had a pulse. Officer Doe was transported to a local medical facility where he later died from the gunshot wounds.

25.     Upon re-entering the vehicle after removing Officer Doe, SMITH backed up the patrol vehicle. At that point dashcam video depicts Officer Doe laying on the ground. SMITH then turned the unit around and drove in the opposite direction from which he came. He drove for another approximate six minutes and stopped again. This time, he exited the vehicle and walked around its frontside, at which time the dashcam video captured SMITH's face as he shot out the patrol unit's flashing lights.

26.     Afterward, SMITH re-entered the vehicle and drove for another approximate 20 minutes before crashing into some shrubbery on the north frontage road off of Interstate 40 near mile marker 304. He abandoned the NMSP patrol unit at that spot.

27.     Responding NMSP officers subsequently located Officer Doe's patrol vehicle at this location. The patrol vehicle appeared to have been crashed.

28.     Officers later located two 9mm shell casings in Officer Doe's patrol vehicle. These casings were not issued by the NMSP and were of two different manufacturers. An NMSP search of the patrol unit additionally located several bullets lodged in the patrol vehicle; specifically, there was a projectile located between the center console and driver's seat, one located in the front passenger door panel, one lodged in the lockbox in the back of the patrol vehicle (normally used

safely to lock a police-issue AR style semi-automatic rifle), and one projectile located in the light bar.

### *Review of Cell Phones Located Near the Crash Site*

29.     NMSP officers advised the FBI that they searched the area around the crashed patrol vehicle. NMSP found a first responder jacket and two phones, the SUBJECT DEVICES, approximately one quarter mile west of the crash site. The SUBJECT DEVICES were found between the shoulder of the road and the guard fence, which was approximately 15 feet north of the road. Locational data from these phones revealed that they were both located near SMITH and Jane Doe 1's residences on March 13, 2024, near the scene of an armed robbery on March 14, 2024 described in detail in this affidavit, and also located near the scene where Officer Doe was abducted and murdered in New Mexico on March 15, 2024 during a carjacking. Therefore, I believe that the SUBJECT DEVICES will contain evidence relevant to the crimes described in Attachment B which occurred in South Carolina and New Mexico.

30.     According to NMSP, the silver Apple iPhone was powered on and unlocked. NMSP personnel accessed the device for the purpose of locating identifying information about the phone's owner to determine if the SUBJECT DEVICES were related to the carjacking incident on I-40 described above. NMSP found a contact in the phone for "dad," called the phone number and spoke to an individual who confirmed his daughter was C.A., a resident of Albuquerque, New Mexico, whose identity is known to the FBI, and provided a phone number for her. NMSP called C.A., who reported she had given the phone to her ex-boyfriend, SMITH, a resident of South Carolina. No additional search of the subject devices was performed. C.A. advised that she had first connected with SMITH via a social media application several years prior while he was in custody serving a sentence in South Carolina. After SMITH was released on December 1, 2023,

he traveled to New Mexico on multiple occasions to meet C.A. in person. During those trips, SMITH resided in C.A.'s residence with her parents. The relationship between SMITH and C.A. ended in late February 2024, and C.A. had given SMITH a cellular telephone prior to that date.

31.     Based on the connection between the SUBJECT DEVICES and the BMW, the proximity of the SUBJECT DEVICES to the crashed NMSP patrol vehicle, and the information relayed from South Carolina regarding SMITH and Jane Doe 1, I submit that probable cause exists establishing that the SUBJECT DEVICES were in the possession of SMITH when he shot and killed Officer Doe and SUBJECT DEVICES were used by SMITH before and after the murder of Jane Doe 1. Based on interviews with C.A. and her reported timeline of when she gave SMITH the iPhone, in addition to cellphone analysis placing SUBJECT DEVICES in similar locations on the dates of the two murders, I also have probable cause to believe the SUBJECT DEVICES contain evidence regarding the abduction and murder of Jane Doe 1 in South Carolina.

32.     An initial review of the SUBJECT DEVICES, conducted by the New Mexico Regional Computer Forensic Laboratory (NMRCFL) and pursuant to original search warrant 24mr483, indicated multiple phone calls and text messages between SMITH and C.A. in or about early and mid-March 2024. The review also appeared to indicate a search for directions to C.A.'s home conducted in or around the early morning hours of March 15, 2024. NMRCFL personnel later reported to FBI Albuquerque the iPhone likely also stored location data relevant to the potential kidnapping and homicide of Jane Doe 1 in South Carolina and SMITH's travel between South Carolina and New Mexico in Jane Doe 1's vehicle, but the NMRCFL examination of the SUBJECT DEVICES was limited to a search for evidence of Officer Doe's carjacking and SMITH's possible whereabouts after the criminal acts committed on March 13, 2024 and March 15, 2024.

### *The Arrest of SMITH*

33.     According to Bernalillo County Sheriff's Office (BCSO) reporting to the FBI, on March 17, 2024, SMITH went to a gas station in the area of Coors Blvd. SW and Blake Rd. SW, in Albuquerque, New Mexico. SMITH utilized a South Carolina identification card to purchase items. The clerk noticed the name on the identification card, "Jaremy Smith," was the same distinct spelling previously disseminated by media news outlets. The clerk contacted law enforcement, and BCSO deputies and NMSP officers responded to the area to investigate. Upon arrival, officers located SMITH, who fled on foot from officers when officers attempted contact. BCSO officers pursued on foot. At that point, BCSO officers reportedly fired their duty weapons striking SMITH, who was subsequently taken into custody and medical aid was rendered. A South Carolina identification card bearing the name "Jaremy Smith" and a Taurus 9mm pistol were recovered near where SMITH was taken into custody. Officers on scene confirmed the individual in custody was SMITH. Officers also confirmed similar facial features and facial hair as the subject observed on Officer Doe's in-car dash cam and body worn camera footage, confirming that SMITH was the individual who committed the carjacking resulting in death of Officer Doe. Additionally, SMITH's South Carolina parole officer observed dashcam video from Officer Doe's car which depicted an African American male outside of Officer Doe's patrol unit. The parole officer confirmed to New Mexico investigators that the individual depicted in the video is SMITH. SMITH was apprehended in or around the neighborhood of C.A.'s parents' home.

### *Interstate Nexus*

34.     The Taurus 9mm firearm recovered near the location where SMITH was arrested was not manufactured in New Mexico or South Carolina. Based upon an open-source search of the National Highway Traffic and Safety Agency, U.S. Department of Transportation database,

the white BMW was not manufactured in the New Mexico or South Carolina.  Officer Doe's patrol unit was not manufactured in New Mexico.

### *Criminal History*

35.     SMITH is a felon, having been convicted of the following offenses which each carry with them a term of incarceration exceeding one year: (1) attempted armed robbery (2015 in South Carolina state court) and (2) hostage taking by an inmate (2018 in South Carolina state court).

36.     Based on my training and experience, I know that cellular devices, like the SUBJECT DEVICES, contain a significant amount of information that is potentially relevant to the investigation of criminal acts. This may include information tending to identify the operator of the devices, the historic physical location of the operator or the deice, and/or the state of mind of the operator including messages and phone calls.

37.     Based on this, I have probable cause to believe the SUBJECT DEVICES will contain evidence of violations 18 U.S.C. § 2119(3) (Carjacking Resulting in Death); 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j) (Causing Death by Discharge of a Firearm During and in Relation to a Crime of Violence); 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death); 18 U.S.C. §§ 922(g)(1), (g)(2), and 924 (Prohibited Person in Possession of a Firearm); 18 U.S.C. § 922(j) (Possession of a Stolen Firearm); 18 U.S.C. § 2312 (Interstate Transportation of a Stolen Motor Vehicle); and 18 U.S.C. § 1073; and 18 U.S.C. § 1073 (interstate flight to avoid prosecution).

## VIOLENT CRIMES AND ELECTRONIC DEVICES

38.     Based upon my training and experience, and on my consultation with other law enforcement officers experienced in investigations regarding violent offenses, including carjacking and firearms offenses, I have learned the following:

a.      Consistent with most of the population, those who engage in criminal offenses often carry electronic devices, to include cellular phones. Such electronic devices are often used to communicate with criminal associates through the telephone's standard capabilities to call and text, as well as through smartphone applications (apps) such as WhatsApp, Snapchat, Instagram, Pinger, Marco Polo and Facebook, which allow users to send and receive digital communications in various forms such as voice calls, text messages, image and video sharing, and live video conversations. Records of these communications, text messages, and contact lists are frequently retained and stored on those electronic devices and within those apps. Based upon my training, experience, and knowledge of this investigation, I believe that such evidence and information can be found on electronic devices.

b.      Based on my training and experience, I know that cellular devices contain a significant amount of information that is potentially relevant to the investigation of criminal acts. This may include information tending to identify the operator of the devices, the historic physical location of the operator or the device, and/or the state of mind of the operator including messages and/or phone calls.

c.      Individuals who commit criminal offenses, especially those with prior criminal histories and those who recently committed other serious crimes, are known to flee from law enforcement or to take efforts to avoid apprehension.  Cellular devices can contain evidence of the individual's record of travel, including data points such as location information, Internet searches, and messages.

d.      Electronic information can remain on computer storage media, such as within cellular phones, for an indefinite period of time. I am aware that even when a user

attempts to delete records from computer storage media, the records may still exist and be recovered through computer forensic techniques.

      e.      A subscriber identity module (SIM) card is a smart card approximately the size of a thumbnail that stores identification information and other data accessed by the user.   The SIM card can store information about the network plan.  A SIM card can be transferred from one device to another to utilize a user's service plan on different devices.

## TECHNICAL TERMS

39.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or MP3 Player or iPod) is a handheld digital storage device designed primarily to store and play audio video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of

numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude,

longitude, and sometimes altitude with a high level of precision.

      e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

40.    Based on my training, experience, and research, I know that cell phones have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41.    Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device in the form of search logs and "cookies." This information can sometimes be recovered with forensics tools.

42.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE(S) were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE(S) because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend

on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE(S) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICE(S) to human inspection in order to determine whether it is evidence described by the warrant.

44.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

45.    Based on the above information, I believe there is probable cause that SMITH violated 18 U.S.C. § 2119(3) (Carjacking Resulting in Death); 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j) (Causing Death by Discharge of a Firearm During and in Relation to a

Crime of Violence); 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death); 18 U.S.C. §§ 922(g)(1), (g)(2), and 924 (Prohibited Person in Possession of a Firearm); 18 U.S.C. § 922(j) (Possession of a Stolen Firearm); 18 U.S.C. § 2312 (Interstate Transportation of a Stolen Motor Vehicle); and 18 U.S.C. § 1073 (interstate flight to avoid prosecution). This affidavit has been reviewed and approved by Assistant United States Attorney Jack Burkhead. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

Michael Connelly
Special Agent
Federal Bureau of Investigation

Sworn telephonically to me and signed electronically
on July 10, 2024:

HONORABLE KAREN MOLZEN
UNITED STATES MAGISTRATE JUDGE
ALBUQUERQUE, NEW MEXICO

## ATTACHMENT A

*Property to be searched*

This warrant is authorizing the search of the silver Apple iPhone with IMEI 357130736160478 and the black "BLU" brand cell phone with unknown IMEI (the SUBJECT DEVICES), both currently in the possession of the New Mexico Regional Computer Forensics Laboratory in the District of New Mexico.

*KBM*

## ATTACHMENT B

*Property to be seized*

All records and evidence relating to violations of 18 U.S.C. § 2119(3) (Carjacking Resulting in Death); 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j) (Causing Death by Discharge of a Firearm During and in Relation to a Crime of Violence); 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death); 18 U.S.C. §§ 922(g)(1), (g)(2), and 924 (Prohibited Person in Possession of a Firearm); 18 U.S.C. § 922(j) (Possession of a Stolen Firearm); 18 U.S.C. § 2312 (Interstate Transportation of a Stolen Motor Vehicle); and 18 U.S.C. § 1073 (interstate flight to avoid prosecution) for the time period of December 1, 2023, to present, that provide evidence of user attribution or evidence relating to the offenses described in this warrant, including, but not limited to:

      a.      Evidence of user attribution showing who used or owned the device at the time the things described in this warrant, including items that were created, edited, or deleted, such as communications, contacts, saved usernames and passwords, documents, and browsing history;

      b.      Online social media accounts;

      c.      Messages sent or received on any platform that constitute evidence of any of the crimes listed in the preamble to this Attachment B;

      d.      Chats, emails, text messages, voicemails, direct messages, or other electronic communications that constitute evidence of any crime listed in the preamble to this Attachment B;

      e.      Internet browser metadata including internet history, form autofill data, stored usernames and passwords, bookmarks, and cache files;

*KBM*

    f.        Geo-location records from December 1, 2023, to March 17, 2024;

    g.        Photographs that constitute evidence of any of the crimes listed in the preamble to this Attachment B;

    h.        Records of installed programs or applications;

    i.        Account access information including logged IP addresses;

    j.        Any and all records of telecommunications services, including telephone billing records and internet subscriber records.

    k.        Any evidence, record, or data, in whatever form, regarding the disappearance, kidnapping, carjacking, and murder of Jane Doe 1 in South Carolina;

    l.        Any evidence, record, or data, in whatever form, regarding the kidnapping, carjacking, and murder of Officer John Doe in New Mexico;

    m.        Any evidence, record, or data, in whatever form, regarding the possession, acquisition, ownership, or transfer of any firearm;

    n.        Any evidence, record, or data, in whatever form, regarding the whereabout of Jaremy SMITH from December 1, 2023, to March 17, 2024;

2.        As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.        This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

*KBM*

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

*KBM*